**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

_____
                                          :
MARY DUNN,                                :       Civil No. 08-cv-1632(FLW)
                                          :
                Plaintiff,                :
                                          :
        v.                                :              **OPINION**
                                          :
REED GROUP, INC., Third Party             :
Administrator for the Johnson & Johnson Long :
Term Disability Plan;                     :
JOHNSON & JOHNSON, a New Jersey           :
Corporation; and                          :
JOHNSON & JOHNSON LONG TERM               :
DISABILITY PLAN,                          :
                                          :
                Defendants.               :
_____:

**WOLFSON, United States District Judge:**

      This is the Court's determination of two separate Motions for Summary Judgment filed by Plaintiff Mary Dunn ("Dunn" or "Plaintiff") and Defendant, the Long Term Disability Plan for Choice Eligible Employees of Johnson & Johnson and Affiliated Companies ("Defendant"); incorrectly plead as "Johnson & Johnson Long Term Disability Plan." Dunn alleges that Defendant wrongfully denied her benefits pursuant to the Long Term Disability Plan ("the Plan") in violation of the Employee Retirement Income Security Act of 1974 29 U.S.C. §1001(a)(1)(b), et seq. ("ERISA"), specifically, 29 U.S.C. §1132(a)(1)(b). For the reasons that follow, the Court denies Defendant's motion for summary judgment and grants Dunn's Motion for Summary Judgment to the extent that the Court remands this case for further administrative review.

1

## FACTUAL BACKGROUND

Dunn, a New Jersey resident, commenced employment with Johnson & Johnson ("J&J" or "the Company"), a corporation with its principal place of business in New Brunswick, New Jersey in 1994. Pl. Statement of Undisputed Facts ("Pl. Facts") at ¶¶ 1-5. Dunn was employed as a warehouse technician, and her duties included driving a forklift and lifting and carrying boxes in excess of 25 pounds. Def. Responses to Pl. Statement of Undisputed Facts ("Def. Resp.") at ¶ 5. Dunn contributed to the LTD Plan during her employment with J&J. Id. at ¶ 4.

*Overview of the Plan*

The Plan was established to provide LTD benefits to eligible employees. Id. at ¶ 3. The J&J Pension Committee ("the Pension Committee") is the Plan Administrator. Id. at ¶ 2. The Plan is funded solely by the contributions of the Plan's participants. Def. Statement of Undisputed Material Facts ("Def. Facts") at ¶ 2. The benefits are provided through the Johnson & Johnson Voluntary Employee Benefit Trust ("the Trust"). Affidavit of Richard McDonald ("McDonald Aff.") at Ex. 1 p. 25. In 1997, Kemper National Services, ("Kemper") was the 3rd Party Claims Administrator for the Plan ("Claims Administrator"). On or about December 31 2003, Broadspire Services ("Broadspire") took over for Kemper as the Claims Administrator. On April 1, 2006, the Reed Group ("Reed") became the Claims Administrator.

According to the Plan, in order to be considered totally disabled, the Plan participant must experience:

a) "the complete inability to perform the material and substantial duties of the participant's *regular job*, with or without reasonable accommodation, AND
b) During the period of disability . . . the complete inability to do *any job* for which the participant is (or may reasonably become), with or without reasonable

2

accommodation, qualified by training, experience or education."  Def. Resp. ¶ 8.[1]

In determining whether a participant is disabled, the Plan grants the Claims Administrator the initial authority to review LTD benefit claims and to hear a participant's first appeal.  Thomas J. Hagner Certification ("TJH Certif.") Ex. 1: Summary Plan Description ("SPD") at pp. 16-17. However, second level appeals are handled by the Pension Committee.  Id.  The Pension Committee then has final review and authority for overturning or affirming LTD claim denials made by the Claims Administrator.  Id.  The Plan requires that, when necessary, the Claims Administrator should be assisted by medical and other experts.  Id. at p. 13.  Additionally, the LTD requires that all participants in the Plan are required to apply for social security disability ("SSD") benefits, and the amount of LTD benefits is offset by the amounts received from SSD benefits.  Def. Resp. ¶¶ 12-13.

*Beginning of Dunn's Disability and Approval of LTD Benefits*

In June of 1997, Dunn stopped working allegedly due to severe and chronic knee pain.  Pl. Facts ¶ 6.  Dunn had surgery on her left knee in 1997.  McDonald Aff. p. 769.  Dunn then applied for LTD benefits under the Plan.  Def. Resp. ¶ 7.  Kemper found that Dunn met the definition for disability under the Plan, and approved LTD benefits on November 26, 1997, in the amount of $1,607.84 dollars per month, as well as continuation of other benefits.[2]  Def. Resp. ¶¶ 7, 10-11, 21. Dunn's benefits commenced on December 3, 1997.  Def. Facts ¶ 4.

---

[1] Plaintiff suggests that the Plan's definition of "disabled" is that a claimant "must be unable to work in any occupation", and that this was different than the definition given to the examining doctors. However, according to the SPD, in order to be eligible for LTD benefits, a participant must be "totally disabled."  SPD p. 9.  According to the Plan, a participant is disabled if, the participant has the "complete inability to do any job. . ."  Def. Resp. ¶ 8.  Furthermore, Plaintiff, in her response to Def. Facts, does not contest that this is the definition of total disability as required by the Plan.  Plaintiff's Response to Def. Facts ("Pl. Resp."), p. 3.
[2] These other benefits include medical, dental and vision benefits, along with life and accident insurance.  Pl. Facts ¶¶ 8-11.

Dunn was then required to apply for SSD benefits to offset the LTD benefits, if possible. SPD p. 27. Defendant, in accordance with the SPD, enlisted the services of Allsup Inc. ("Allsup") to aid Dunn in the SSD application process. Def. Resp. Id. at ¶ 17. In 1998, Allsup began the process of obtaining SSD benefits for Dunn, and Dunn agreed to reimburse the Plan for SSD benefits received. Id. at ¶¶ 21-27. As of October 16, 1998, Allsup informed Kemper that the initial decision was a denial, and Allsup was moving for reconsideration. Id. On August 16, 1999, Allsup advised Kemper that the motion for reconsideration had been denied, and that it would file an appeal. Id. at ¶¶ 39-39. After these initial denials, Dunn ultimately received SSD benefits beginning in December 1999, as the Administrative Law Judge granted Dunn's appeal. Id. at ¶¶ 45-46. Dunn was entitled to receive benefits of $20,486 retroactively for the period from December 1997 to November 1999. TJH Certif. Ex. 18. Additionally, Dunn would also receive $837.00 per month in SSD benefits. Id. As a consequence, her LTD benefits would be offset by the SSD benefits. SPD p. 23.

On April 19, 1999, following a thorough investigation, Kemper determined Dunn was "disabled from any job." Def. Resp. at ¶ 28. Kemper continued to monitor Dunn's health in accordance with the SPD, which states that participants that are receiving LTD benefits may be required to submit additional information regarding their status as disabled, and participants may have to undergo an examination from a health care provider chosen by the Claim Administrator. SPD p.13.

As part of Kemper's investigation into Dunn's conditions, Dunn submitted a LTD Questionnaire on May 10, 1999. TJH Certif. Ex. 11. Dunn indicated she was seeing an orthopedic specialist, a rheumatologist, and a psychotherapist, and was unable to do certain household activities "sometimes," but was capable of running "errands". Id. at p. 146. Dunn also alleged that she had

4

"extremely painful" arthritis in her hands.  Id. at p. 148.  The questionnaire was not signed by Dunn, but by Tom Venti, Dunn's friend.  Id. at p. 149.  Dunn alleges that Venti had to fill out the questionnaire because she was incapable of doing so.  Pl. Facts ¶ 34.

In addition to the May 10 questionnaire, Dunn also submitted correspondence from Cynthia Ireland, L.S.C.W, dated June 1, 1999, to Kemper.  TJH Certif. Ex. 12.  In the correspondence, Ireland indicated that sometimes Dunn seemed overwhelmed with physical and psychological problems, including pain, anxiety and difficulty interacting with people.  Id.  Consistent with that diagnosis, Ireland reported to Kemper on May 1, 2000, that "patient has the same diagnosis" and that Dunn was not a candidate for rehabilitation because ". . . the problem is she can't sit, stand or walk without discomfort."  McDonald Aff. at pp. 805-806.  Ireland diagnosed Dunn as being incapable of sedentary work.  Id. at pp. 806.

Kemper also requested an independent medical evaluation ("IME") from Dr. Steven Weitz to determine whether Dunn had the ability to obtain "any gainful employment."  TJH Certif. Ex. 15.[3] Following its investigation, Kemper chose not to terminate Dunn's benefits.  Def Resp. ¶ 41.

Given that Dunn was receiving SSD benefits, including back-benefits, in accordance with the SPD, Kemper requested repayment of the overpayment balance of LTD benefits in the amount of $22,948.63, and reduced LTD monthly payments to $756.86.  TJH Certif. Ex. 18.  Dunn offered to pay $5,000 of the balance and set up a payment plan for the remaining balance.  Id. at Ex. 19.  In response, Kemper accepted the $5,000 payment from Dunn, and took the monthly $756.86 LTD payment and applied it to the overpayment balance until the balance was repaid.  Id. at 20.  By 2004, Broadspire (change in name of Claims Administrator from Kemper to Broadspire), indicated that

---

[3] The record is devoid of any report from Dr. Weitz.  However, the conclusion of Kemper's investigation was to continue LTD benefits for Dunn.

Dunn had repaid nearly the entire balance.  TJH Certif.  Ex. 21; Def Facts ¶ 42.

*Broadspire's Investigation into Dunn's Disability*

In 2004, Broadspire sent Dunn a letter requesting a "medical update."  TJH Certif.  Ex. 25.
Dunn submitted a LTD questionnaire on March 16, 2004, indicating that she was in "constant
discomfort when doing anything longer than 15 minutes;" as a result, Dunn claimed she was unable
to work.  Id. at Ex. 26.  Dunn stated that she "ha[d] many physical and mental shortcomings that
render[ed] [her] from becoming gainfully employed."  Id.  On March 19, 2004, at Broadspire's
request, Dunn submitted a Behavioral Health Clinician Statement from Dr. Ko, diagnosing major
depression, and an inability to perform physical work.  Id. at Ex. 27.  In addition, on June 23, 2005,
Dunn's rheumatologist, Dr. Steven Burnstein D. O. ("Dr. Burnstein"), submitted a letter that Dunn
was taking Oxycontin to combat her osteoarthritis, and that Dunn's primary diagnosis was
osteoarthritis and fibromyalgia.  Id. at Ex. 28.  However, Burnstein also indicated that she "might
be able to get off Oxycontin" if she were to lose more weight.  Id.  Dr. Burnstein's letter contained
little, if any objective findings.  Def. Facts ¶ 48.  From this point until January 2006, Broadspire took
no steps to physically examine Dunn, and Dunn's LTD benefits continued.[4]

In January 2006, Broadspire requested that Dunn undergo an IME, and received a report
from Dr. Costino in February 2006.  Id. at Ex. 30.  The report indicated that Dunn had significant
osteoarthritis in her left knee, and found evidence of early degenerative disease in the right knee.
 Id.  Dunn was "habituated with opioids, taking Oxycontin".  Id.  The report further indicated that
Dunn's tandem gait was mildly antalgic favoring the left knee (walking with a limp), but did not
experience ataxia (loss of muscle coordination).  Id.  Dr. Costino also acknowledged that Dunn was

---

[4] On June 27, 2005 Dunn submitted another LTD questionnaire, essentially repeating her earlier
statements. TJH Certif. Ex 29 ("I cannot sit, stand, or walk for any reasonable amount of time . .
. ."

suffering from bipolar depression and taking several drugs to combat the depression.  Id.  It is noteworthy that Dr. Costino did not report any medical problems regarding Dunn's manual dexterity.  Id.  Other than the gait dysfunction, Dr. Costino did not report any other spinal or neurological problems.  Id.  Dr. Costino concluded that Dunn was capable of working at a sedentary job while on her current medication, however a specific type of job was not referenced, nor whether Dunn would need any accommodations.  Id.

Additionally, Dunn was examined by Dr. Patrick McHugh, an independent clinical psychologist on February 24, 2006.  Id. at Ex. 32.  Dr. McHugh acknowledged that Dunn's reasons for referral included bipolar disorder, fibromyalgia, and osteoarthritis.  Id.  It was Dr. McHugh's opinion that Dunn did have a tendency to be more emotional than normal.  Id. at Ex. 32 ¶ 4.  Additionally, Dunn scored a 50 on the Global Assessment of Functioning ("GAF").  Id. at Ex. 32 p.365.  Typically a score of 50 on the GAF is associated with "serious symptoms" of a mental disorder or serious impairment in social, occupational or school functioning.  Id. at Ex. 33.

However, in his conclusions, Dr. McHugh found that Dunn functioned "within the range of average" and had no severe memory or cognitive problems, and was not psychotic.  Id. at Ex. 32, ¶ 2-3.  He further found that any limitations that Dunn would have in the workplace would be more medical or physical than psychological, and that Dunn's bipolar condition would not prevent her from working a sedentary occupation.  Id. at Ex. 32 ¶ 5.  Following Dr. Costino's and Dr. McHugh's reports, Broadspire terminated Dunn's benefits, effective May 06, 2006.  Id. at Ex. 31.  The denial was based on the IMEs that took place on January 31, 2006 and February 24, 2006, performed by Dr. Costino and Dr. McHugh, respectively.  Id. at Ex. 30-32.

*The First Appeal*

In accordance with the SPD, Dunn appealed the denial of benefits on May 15, 2006, to

Broadspire, Pl Facts ¶ 91, but Dunn was informed, on May 22, 2006, that the Reed Group ("Reed")

had taken over as the Claims Administrator for the Plan.  Id. ¶ 99.  Dunn's appeal was supported by

correspondence from Dr. Burnstein, dated April 28, 2006.  Id. at ¶ 92.  Dr. Burnstein was of the

opinion that Dunn suffered from generalized osteoarthritis and fibromyalgia syndrome (FMS).  TJH

Certif. Ex. 35.  Dr. Burnstein indicated that Dunn had undergone an arthroscopic surgery "last

week", and had already undergone similar procedures twice in the past.[5]  Id.  The report further

stated Plaintiff was on multiple medications.  Id.  Dr. Burnstein noted that Dunn needed a cane to

ambulate and that she had swelling in both knees.  Id.  Also, Dr. Burnstein addressed the condition

of Dunn's hands.  This was the first time that any physician noted a problem regarding Dunn's

manual dexterity.  Dr. Burnstein stated that Dunn had degenerative changes in her hands and had

multiple FMS trigger points.  Id.  Accordingly, Dr. Burnstein concluded  that Dunn was totally and

permanently disabled and thus, she was unable to maintain any sort of employment.  Id.

According to the SPD, if the initial denial on appeal is based in whole or in part on a medical

judgment, the Claims Administrator will consult with a health care professional with "appropriate

training and experience in the field of medicine involved in the medical judgment."  SPD p. 16.

This professional must  not have been consulted in the initial determination.  Id.  Prior to any review,

Reed, in a letter dated July 7, 2006, informed Dunn that it was denying her appeal.  Def. Facts  ¶ 64.

Reed explained that Dunn was no longer considered disabled under the Plan's definition because

she was capable of returning to sedentary work, and that the letter from Dr. Burnstein and the IMEs

completed by Dr. Costino and Dr. McHugh were "included in the review." TJH Certif. Ex. 38.

Four days later, on July 11, 2006, Reed forwarded Dunn's file for Peer Review by a

physician consultant.  Def. Facts ¶ 65.  The Peer Review, conducted by Dr. James Leyhane M.D.,

---

[5] Dunn has not submitted any medical documentation regarding the arthroscopic surgeries.

found that the "preponderance of evidence favored returning to work in a sedentary position."  Id. at ¶ 66.  Reed then sent a second denial letter to Dunn, dated July 11, 2006, stating that she did not meet the definition of disabled.  TJH Certif. Ex. 37.  In addition to the three reports cited in the July 7 letter, Reed stated that the Peer Review was considered in its decision to affirm the denial of Dunn's LTD benefits.  Id.

Dunn, through counsel, then made two requests to Reed for her claims file.  Id. ¶¶ 113-114. On August 22, 2006, Reed's claims file was received by Dunn, which Dunn maintains is incomplete.[6]  Id. ¶ 115.  Dunn avers that Dr. Leyhane was not qualified to conduct a Peer Review in accordance with the terms of the Plan.  In response, Defendant submits that Dr. Leyhane is a certified specialist in internal medicine, and that, under the Plan Dr. Leyhane was fully qualified to review Dunn's appeal.  TJH Aff. Ex. 45; Def Resp. ¶ 124.  Dunn then filed suit against the Plan in September 2006, which the parties agreed to terminate in favor of a second administrative appeal, in accordance with the SPD.  Id. at ¶ 129; SPD p. 17.

*Dunn's Second Appeal*

Dunn filed a second administrative appeal on January 3, 2008.  Pl. Facts ¶ 130.  The SPD requires that the second level appeal be conducted without deference to the first level appeal.  SPD p. 17.  This appeal, in accordance with the SPD, was conducted by the Pension Committee.  TJH Certif. Ex. 51.  In addition to the previous correspondence submitted from Dr. Burnstein, Dunn submitted correspondence from a psychologist, Dr. Jay Schmulowitz, Ph. D. ("Dr. Schmulowitz"), dated December 27, 2007.  TJH Certif. Ex. 48.  Dr. Schmulowitz stated that he conducted the Beck

---

[6] Dunn asserts the claims file consisted only of two copies of Broadspire's letter to Dunn stating that Reed was not the Claims Administrator, a transmittal form, a FedEx slip, and a chronology with two entries from May 22, 2006.  The Defendants assert that the entire claim file was sent to Dunn.

Depression Inventory, which obtained results indicative of severe depression. Id. Dr. Schmulowitz also completed a Sentence Completion Inventory, "corroborating manic and depressive symptoms, consistent with bipolar disorder as well as significant paranoid ideation." Id. The report also noted that Dunn reported constant pain and difficultly sleeping. Id. Dr. Schmulowitz concluded that Dunn was diagnosed with bipolar disorder, paranoia, and pain disorder, and as a result, "lacks the emotional resources to be productive at a job even on a part time basis." Id.

Dunn also informed the Pension Committee that she was currently receiving SSD benefits, and her SSD benefits were obtained through Allsup. Id. at Ex. 47. Dunn asserted that Allsup was the Plan's agent and demanded an explanation of why Dunn was eligible for SSD benefits but not for LTD benefits. Id. In a subsequent letter to the Plan dated January 4, 2008, Dunn also requested that the Pension Committee consider the combined effect of her physical and psychological effects in making its claim decision. Id. at Ex. 54.

The Pension Committee denied the appeal on February 26, 2008, and in its denial, did not mention Dunn's SSD benefits. Pl. Facts ¶ 148. The denial letter stated "all of the independent medical professions engaged by the Plan … conclude[] that [Dunn] no longer [has] the complete inability to perform any job for which [Dunn] [is] . . .qualified for based on training, education, experience, with or without reasonable accommodation." TJH Certif. Ex 51. In conducting the second level appeal, the Pension Committee relied on two independent Peer Reviews, conducted by Dr. Jean Dalpe M.D. ("Dr. Dalpe"), and Dr. Ara Dikranian M.D. ("Dr. Dikranian"). Id. These independent Peer Reviews examined Dunn's prior claim applications, including the past IMEs of Dr. Costino and Dr. McHugh. Id. at Ex. 52-53.

Dr. Dikranian recommended that Dunn, as of March 26, 2006, was no longer disabled under the Plan, and that the medications Dunn was taking at the time of the denial would not impair her

from working.  Id. at Ex. 52 p. 6.  Although Dr. Dikranian acknowledged that osteoarthritis and FMS

had been diagnosed, he opined that the documentation of such conditions, especially FMS, was not

consistent.  Id.  The report discussed the past IME by Dr. Costino, noting the conclusion that Dunn

suffered from severe osteoarthritis, but indicated that there was insufficient documentation to

support a finding of FMS.  Id.  The report also found that Dunn's "mentation (mental activity) is

intact" while on Oxycontin and other medications.  Id. at Ex. 52 p. 7.

Dr. Dikranian also referenced the conclusions of Dr. Burnstein and found that other than

Dunn's left knee, Dunn's medical problems were not supported by repeated normal physical

examinations, or that Dunn's medications impaired her "concentration, memory or cognitive

functions."  Id.  Dr. Dikranian ultimately found that neither her diseases nor her therapies would

support a total disability, or support an inability to perform a sedentary occupation.  Id.

Likewise, Dr. Dalpe, examining Dunn's psychiatric condition, recommended that Dunn was

not totally disabled.  Further, Dr. Dalpe opined that the medication Dunn was taking would not

impair her from doing any job with or without reasonable accommodation.  Id. at Ex. 52 p. 15.  In

addition, Dr. Dalpe noted that Dr. McHugh's report found no severe memory problems or cognitive

difficulties.  Id. at Ex. 52 p. 16.  And, while Dr. Dalpe mentioned Dr. Schmulowitz's report, he did

not address or refute its conclusions.  Based on the peer reviews of Dr. Dikranian and Dr. Dalpe,

Dunn's second appeal was denied by the Pension Committee.  Id. at Ex. 51.

Subsequently, on April 2, 2008, Dunn filed the instant action.  In her one count Complaint,

Dunn seeks all past and future benefits, pursuant to §502(a)(1)(b) of ERISA.  The parties then both

filed motions for summary judgment pursuant to Fed. R. Civ. P. 56, claiming that the Court may

decide this case as a matter of law as there is no genuine issue of material fact.

## DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed.R.Civ.P. 56©. For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J.1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements...'" Trap Rock Indus., Inc. v. Local 825, Int'l

Union of Operating Eng'rs., 982 F.2d 884, 890 (3d Cir.1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.1991)).  Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial."  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  Indeed, the plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992).

## B. Applicable Standard of Review Under ERISA

In evaluating Dunn's claim, the Court's first task is to determine the applicable standard of review under ERISA.

The Supreme Court, in Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989), held that a denial of benefits under ERISA is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Id. at 115.   Thus, where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "will not be dismissed if reasonable." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d. Cir. 1997) (quoting Firestone, 489 U.S. at 111).  In other words, when a plan administrator has discretion to determine a claimant's eligibility for benefits, the plan administrator's decision is subject to review under an arbitrary and

capricious standard.  See Stoetzner v. United States Steel Corp., 897 F.2d 115, 119 (3d. Cir 1990) (application of deferential arbitrary standard of review appropriate when benefit plan gives administrator discretionary authority to determine eligibility); see also Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991) (held the same).

However, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  Firestone, 489 U.S. at 115; see Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004).  A conflict of interest can be created, for example, when an employer both funds and evaluates employee claims.  Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008).  A conflict of interest can also be created if an employer "pay[s] an independent insurance company to fund, interpret and administer a plan.  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000).  However, a conflict of interest is not present if an employer funds a benefits plan, but an independent third party is paid to administer the plan.  Id.  Additionally, if an employer establishes a plan and creates an internal benefits committee vested with the discretion to interpret the plan and administer benefits, a conflict of interest is not found.  Id.; see also Post v. Hartford Ins. Co., 501 F.3d 154, 164 n. 6 (3d Cir. 2007).

Recently, the Supreme Court in Glenn altered the way in which a conflict of interest is handled by the courts.  Glenn, 128 S.Ct. at 2350.  Previously, a finding of a conflict of interest resulted in the heightening of the arbitrary and capricious standard along a sliding scale, taking into account several factors including: the "sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and the company; and the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction."  Stratton v. E.I. Dupont de Nemours & Co., 363

F.3d 250, 254 (3d Cir 2004)(internal quotations omitted).

Glenn rejected heightening the arbitrary and capricious standard. The Supreme Court reasoned that Firestone held that the word "factor" implies that courts should review the propriety of benefit denials, by taking into account many factors, including a conflict of interest. Glenn,128 S.Ct. at 2351. Effectively, the Court reaffirmed Firestone to the extent that deference should be given to "the lion's share of ERISA claims." Id. at 2350. The Court opined that the conflict of interest may be more important in circumstances "suggesting a higher likelihood that it affected the benefits decision," and would prove less important "when the administrator has taken active steps to reduce potential bias." Id. at 2351. Potential bias could be reduced "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." Id. In any event, the governing standard requires the plaintiff to show that the denial of benefits was arbitrary and capricious, with a conflict of interest as simply one factor for the court's consideration. See Dolfi v. Disability Reinsurance Management Services, Inc., 584 F.Supp.2d 709, 730 (M.D. Pa. 2008) (citing Glenn, 128 S.Ct. at 2350).

Dunn admits that the Plan is funded solely by its participants, but argues that a conflict of interest is still present. Dunn points out that if she were to remain on LTD benefits, then she would still be considered an employee, and become eligible for medical and life insurance benefits – at a cost. Dunn argues that this alone creates a conflict of interest that should be considered by the Court.

However, contrary to Dunn's contentions, a structural conflict of interest is not present. Plaintiff cites no authority that holds that the continuation of insurance benefits is a sufficient financial incentive for a pension committee to deny LTD benefits. Even if payment of insurance

15

benefits could create a conflict of interest, a conflict does not exist here, as the insurance benefits are funded through trusts. See Post, 501 F.3d at 164 n.6. In addition, the Plan establishes that initial claims decisions, and the first level of appeals are determined by a third party Claims Administrator, independent of Defendant. The second level appeal, administered by the Pension Committee, is an internal committee vested with discretionary authority to make decisions regarding LTD benefit appeals. The Pension Committee has no financial incentive to deny benefits since the Pension Committee is not liable for LTD benefits. Moreover, the LTD program is entirely funded by the Plan participants, and the benefits are provided through a trust, not the Pension Committee or Defendant. Accordingly, the Court finds that the Claims Administrators have been "walled off" from any conflict of interest; the Court does not find a structural conflict of interest to be a factor in determining whether the denial of LTD benefits to Dunn was arbitrary and capricious.

Next, Dunn argues that a heightened arbitrary and capricious standard is appropriate due to Defendant's alleged bad faith or procedural bias in handling her claim. Prior to the Glenn decision, if the Court were to find procedural bias, the arbitrary and capricious standard could be heightened. See Kosiba, 384 F.3d at 68. In this regard, Dunn relies on Kosiba. While Dunn is correct that the Third Circuit previously employed a moderately heightened arbitrary and capricious standard because of a procedural bias, after Glenn, supra, this type of review has been abrogated. The Third Circuit has held that "in light of Glenn, our 'sliding scale' approach is no longer valid." Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009). The Third Circuit elaborated:

> As Glenn recognized, benefits determinations arise in many different contexts and circumstances, and, therefore, the factors to be considered will be varied and case-specific. Glenn, 128 S.Ct. at 2351. In Glenn, factors included procedural concerns about the administrator's decision making process and structural concerns about the conflict of interest inherent in the way the ERISA-governed plan was funded; in another case, the facts may present an entirely different set of considerations. Id. at 2351-52. After Glenn, however, it is clear that courts should "take account of several

different considerations of which a conflict of interest is one," and reach a result by weighing all of those considerations.  Id. at 2351.

Estate of Schwing, 562 F. 3d at 526 (emphasis added).  In accordance with Glenn and the Third Circuit's approach with regard to procedural bias in Estate of Schwing, the Court may consider any procedural bias as a factor in determining whether the denial of benefits was arbitrary and capricious.

Nevertheless, Kosiba is still instructive on deciding whether a bias exists.  The Third Circuit in Kosiba found that a procedural bias exists where there is a "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." Kosiba 384 F.3d at 66. A procedural bias was found in Kosiba when Merck, the employer, requested an IME from plaintiff during her appeal of a denial of benefits to the claims administrator.  The court reasoned,

> the circumstances under which Merck made this request necessarily raise an inference of bias: At the time of the request, [all] evidence in [plaintiff's] record, the opinions of two doctors. . ., a consistent medical history, and an SSA determination that she was totally disabled, supported her contention that she was disabled."

Id. at 67.  Given these facts, the court found a procedural bias existed.

Here, unlike Kosiba, the request for an IME was done by Broadspire, who was actively handling Dunn's claim.  In this regard, there is no evidence that Broadspire failed to follow the terms of the Plan in requesting an IME.  See Hunter v. Federal Express Corp., 169 Fed. Appx. 697 (3d Cir. 2006).  However, at the time of a request for an IME, all evidence in the record did favor Dunn's claim of disability, and Dunn was receiving SSD benefits.  Additionally, a procedural irregularity exists in the record.  Dunn's first appeal to Reed was summarily denied on July 7, 2006, without a Peer Review of Dunn's file.  Four days following the denial, on July 11, 2006, Dunn's file was sent for a Peer Review, which consisted of a one paragraph, handwritten opinion, and a second denial letter was subsequently sent to Dunn on the same day.  TJH Certif. Ex. 37.  Given this

17

chronology, the Court finds a procedural irregularity, which will be considered in determining whether the denial of LTD benefits was arbitrary and capricious.

Under the arbitrary and capricious standard, the claim determination will be upheld if it is supported by substantial evidence.  Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quoting Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D. Pa. 1989);  (Under the arbitrary and capricious (or abuse of discretion) standard of review, the district court may overturn a decision of the Plan administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."); see also Miller, 925 F.2d at 984 (ERISA plan administrator's decisions on eligibility are not arbitrary and capricious if rational in light of plan's provisions) (citation omitted).  "This scope of review is narrow, and the Court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." Id.  Although the arbitrary and capricious standard is extremely deferential, "[i]t is not ... without some teeth."  Moskalski v. Bayer Corp., 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008). "Deferential review is not no review, and deference need not be abject."  Id.  (citation omitted). Substantial evidence requires more than a "mere scintilla" of evidence."  Id. at *4 n. 3 (citation omitted).  Ultimately, Dunn bears the burden of proof and must present the required medical information to the Plan in order for the Plan (through the Claims Administrator and/or the Pension Committee) to find that she is totally disabled.  Id. at 46-47; see also Mitchell, 113 F.3d at 439-440.

## C.  Analysis

Dunn argues that Defendant's decision to deny LTD benefits was arbitrary and capricious because 1) Defendant failed to obtain a vocational analysis; 2) Defendant failed to consider the combined effects of her physical and mental problems; 3) Defendant failed to provide reasoning why Dunn's LTD claims were denied; 4) Defendant is judicially estopped from arguing that Dunn is

capable of sedentary employment; and 5) Dunn was receiving SSD benefits and yet, she was denied LTD benefits without any consideration of her SSD award.  The Court will address each of Plaintiff's arguments in turn.

      1. *Vocational Analysis*

Plaintiff argues that by failing to obtain a vocational analysis, the denial of benefits was arbitrary and capricious.  Plaintiff points out that Broadspire Services had used vocational analyses in the past, and Broadspire failed to do so in connection with her claim.  See, e.g., Porter v. Broadspire and The Comcast Long Term Disability Plan, 492 F. Supp 2d 480, 491 (W.D. Pa. 2007); Shah v. Broadspire Services, Inc., 2007 WL 2248155, at *3 (D.N.J. Aug. 2, 2007).   While a vocational analysis is not a requirement of a claim determination under the Plan, SPD, pp. 13-17 (requiring that consultation with medical experts may be necessary, but does not require a vocational assessment), Defendant is still obligated under ERISA to provide a well-reasoned explanation of its decision including which sedentary jobs Plaintiff is capable of working, with or without accommodations.  See Havens v. Continental Casualty, Co., 186 Fed. Appx. 207, 212-13 (3d Cir. 2006).

Generally, the Third Circuit does not obligate an employer to conduct a vocational analysis if one is not required by the Plan.  See Morely v. Avaya Inc. Long Term Disability Plan for Salaried Employees, 2006 WL 2226336, at *20 (D.N.J. Aug. 3, 2006) ("Morley cites to nothing in the plan documents that would have required Gates to seek a vocational assessment or independent medical examination during her disability assessment"); Vega v. Cigna Group Ins., 2008 WL 205221, at *7 (D.N.J. Jan. 23, 2008) (Plan did not require a vocational assessment, and the court held that Claims Administrator may conduct a vocational assessment, but it is not required).  The use of IMEs and vocational assessments are discretionary and only necessary when based on the evidence presented.

Morely, 2006 WL 2226336 at *20.

Nevertheless, Dunn argues that a failure to conduct a vocational analysis in this case was arbitrary and capricious.  The Court disagrees that a vocational analysis is necessary in this case, however, the Court finds that Defendant's decision that Plaintiff could work in a sedentary job, without a discussion of Plaintiff's skills or capacity and how these skills transferrable to sedentary jobs, may not have been based upon substantial evidence.  In other words, the lack of vocational evidence in the record does not reflect on the adequacy of Defendant's investigation, but instead on whether Defendant's conclusion is, as required by law, supported by sufficient medical evidence.

In Havens, the Third Circuit dealt with similar ERISA plan language which excluded a plan participant from obtaining LTD benefits if he/she could engage in "any occupation."  Havens, 186 Fed. Appx. at 208.  In that case, defendant insurance company, despite the plan language, conducted a vocational review to determine whether Havens was disabled from "any occupation."  Id. at 210.  The insurer, through a vocational expert, found that based on Havens' age, work history, education, location and function, he was able to perform project/construction manager, supervisor-property inspection and sales building materials.  Id.  The Third Circuit rejected defendant's decision and found that the insurer's "finding that Havens was capable of performing alternate occupations was arbitrary and capricious."  Id.  The court explained:

> The irreducible logical core of such a finding is that a claimant has residual functional capacity that equals or exceeds the functional requirements of a feasible alternate occupation.  These two determinations - the claimant's capacity and the occupation's requirements - must together be detailed enough to make rational comparison possible.  Otherwise, the "finding" that the claimant can perform alternate occupations consists only of a bald assertion.

Id. at 212.  Based on that reasoning, the court held that defendant did not make any determinations

as to plaintiff's capacity and the occupation's requirements despite the fact a vocational review was conducted.  Indeed, while defendant had substantial medical evidence to show plaintiff's capabilities and inabilities, defendant failed to "connect that evidence to Haven's actual physical capacity."  Id. at 213.  The court also found that the denial letters' mere mention of names of the occupations was insufficient.  Explicitly, the court required defendant to "describe the occupations," or "name any other source that might provide such information."  Id.  In the absence of these determinations, the court found that defendant's vocational analysis insufficient, and therefore, its decision was arbitrary and capricious.

The court in Moskalski v. Bayer Corp., 2008 U.S. Dist. LEXIS 39970 (W.D. Pa. May 16, 2008), elaborated on these Third Circuit principles. The defendant in Moskalski denied plaintiff benefits because he failed to submit evidence on his own behalf; benefits were terminated without submitting Moskalski to an IME.  Finding that the denial of benefits was arbitrary and capricious, the court elucidated:

> While a plan administrator is under no obligation to conduct a 'full-blown vocational evaluation' of a claimant's job, it must make a reasonable inquiry into the types of skills a claimant possesses and whether those skills are transferable to another occupation.  Where there was no objective evidence such as a vocational assessment or reasoned medical opinions to support the conclusion that [claimant] could return to work, while medical evidence from her long-term treating physicians indicated total disability, [the plan] had the burden of showing it had a factual basis for its conclusion.

Id. at *20 (internal citation and quotations omitted).  In other words, while ERISA "stopped short of imposing on Plan personnel an investigative duty does not absolve such personnel of the responsibility to ensure that benefits are made with adequate factual support."  Id. at *21.  To that end, "medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability."  Id. at *22 (citations and quotations omitted).

In the present case, Dunn has undergone two IMEs, both finding Plaintiff could perform sedentary work, without any additional analysis or reason as to what types of jobs Plaintiff could perform in light of her medical conditions.  Indeed, Dunn was sent for IMEs regarding both her physical and psychological issues.  Dr. Costino reported on Dunn's physical condition, and found Dunn capable of working a sedentary job, without any determination as to her capabilities in light of her conditions and the occupation's requirements.  TJH Certif. Ex 30.  Dr. Costino discussed, among other things, Dunn's spine, extremities, neurologic functioning, as well as Dunn's past medical history.  Id.  Dr. Costino's report stated:

> Based upon the history and physical examination of Mary Dunn, age 47, it is my impression that the patient suffers from severe osteoarthritis of her left knee, along with hypothyroidism and bipolar depression.  She is currently habituated with opioids, taking a number of psychotropic drugs for her bipolar depression.  While she may fulfill the criteria for fibromyalgia off of the opioids, while currently taking 300 mg of Oxycontin per day there is no evidence of fibromyalgia.

> Based upon a reasonable degree of medical probability, in conjunction with this examination, and the patient's medical history, it is my opinion that she is capable of working in the sedentary position eight hours per day taking her current medication.

Id.  This report failed to indicate what types of sedentary jobs Dunn is capable of performing in light of her mental and physical conditions.  The mere conclusion that Dunn is capable of sedentary work is a bald assertion without a proper explanation.

Equally deficient is Dr. McHugh's IME report.  Dr. McHugh found that despite Dunn's low GAF score, Dunn was capable of working in a sedentary job.  TJH Certif. Ex 32.  In so finding, Dr. McHugh examined Dunn's psychological health, her past medical history, and her current medications.  Id.  After administering several tests, Dr. McHugh concluded:

> Based on objective testing of Ms. Dunn's performance during this evaluation, she seems to have no severe memory problems or cognitive difficulties.  She functions overall within the range of average of average. . . There were no suggestions of

> neurological impairment or severe cognitive or neurological interference with her ability to focus and follow through on tasks…
>
> There are clear indications that this woman suffers from a bipolar disorder, and possibly attention deficit disorder.  Neither of these, however, would prevent her from working in a sedentary position while on medications.

Id.  Indeed, the same deficiencies are found in this report.  While there may be substantial medical basis for Defendant to determine that Plaintiff is capable of sedentary work, there are no factual findings that there are sedentary positions for which Plaintiff would be qualified to work.  In other words, the medical data, without reasoning, cannot produce a logical judgment about Plaintiff's work ability. Even more simply stated, Defendant has failed to connect the medical evidence to Dunn's actual physical capacity.

In that regard, the Court finds that Defendant's determination that Plaintiff is not totally disabled within the meaning of the Plan is without appreciable support in the record.  The denial letters and medical opinions relied upon by Defendant lack explanation for Defendant's ultimate finding of employability, and consequent non-disability.  It is important to note that the Court's holding here does not compel Defendant to hire a vocational expert and engage in a full-blown vocational assessment.  Rather, Defendant must make adequate factual findings to substantiate its conclusion that Plaintiff is capable of sedentary work.[7]

Nevertheless, the Court finds Plaintiff's argument regarding her arthritis without merit.  Specifically, Plaintiff contends that because she has arthritis in her hands which would prevent her from performing sedentary work, a vocational analysis is necessary in order to determine if she is

---

[7]The Court also concludes that even if Defendant's denial were to survive an application of the arbitrary and capricious standard, having previously determined that a procedural irregularity exists as a factor, it does not survive the Court's scrutiny with this additional bias factor which affords less deference to Defendant.

23

capable of performing such work.  However, the administrative record lacks evidence of arthritis in Dunn's hands; Plaintiff has failed to submit competent medical evidence to substantiate her assertion of arthritis.  See Abnathya, 2 F.3d at 46 (The Plan requires participants to submit evidence to substantiate eligibility for continuing benefits. . . but Abnathya has never submitted evidence that her thyroid condition causes total disability. . .accordingly, there is no basis for the district court's conclusion that Hoffmann unreasonably failed to consider Abnathya's hyperthyroidism as a basis for LTD benefits").  Here, in all of the IMEs, no mention of arthritis or abnormalities concerning Dunn's hands and wrists has been reported.  TJH Certif. Ex. 30, 52.  Additionally, although Dr. Burnstein opines that Dunn has arthritis in her hands, this conclusion is not supported by any treatment records or test results.  While Dr. Burnstein did report that Dunn had FMS trigger points, he failed to provide any objective test results or medical records to support his findings. Furthermore, Dr. Dikranian's IME indicates "although lumbar osteoarthritis has been mentioned on a few occasions, there is no documentation of lumbar tenderness apart from fibromyalgia."  In sum, there is no evidence, other than Dr. Burnstein's cursory statements, indicating that Defendant abused its discretion in failing to order a vocational assessment for Dunn.  See Vega, 2008 WL 205221 at *7.  Therefore, the fact that Defendant did not perform a vocational assessment based on Dunn's arthritis does not render its claims decision arbitrary and capricious.

2.   *The Independent Peer Reviews of Dr. Dikranian and Dr. Dalpe Refute Dunn's Contention that the Plan Refused to Consider Dunn's Physical, Mental, and Medication issues in Combination*

Next, Dunn argues that Defendant ignored her request to consider the difficulties created by her medical, mental, and medication problems.  To that end, Dunn argues her conditions in combination render her disabled under the Plan.  For support, Dunn relies on a case from the District of Arizona, Lawrence v. Motorola, Inc., 2006 WL 2460921 (D. Ariz. Aug. 24, 2006), wherein that

24

court found that an administrator abused its discretion by failing to "consider the combination of the claimant's impairments." Id. at *8 (The Plan administrator, in rendering its decision, should have considered whether Lawrence's physical impairments, combined with his mental impairments flowing from his physical conditions, were disabling). However, unlike here, Lawrence was examined by a psychiatrist, who found that Lawrence was not disabled due to any psychiatric condition, but also found that Lawrence's chronic pain "seem[ed] to be a genuinely disabling factor." Id. Lawrence was then referred for a physical examination, and that physician concluded Lawrence was not disabled due to a lack of objective medical evidence. Id. The physician, however, did not base his conclusion on any objective testing. Based on this information, benefits were denied. Id. Under those circumstances, the court found that the administrator had failed to consider the combination of ailments. Id.

Here, the review of Dunn's file was done in a much different fashion because the Pension Committee did take into account the combination of Dunn's ailments. During Dunn's second level appeal, both Peer Reviews, performed by Dr. Dikranian and Dr. Dalpe, found that Dunn was capable of performing a sedentary job. Neither doctor suggested that Dunn would be incapable of performing sedentary work for any reason. Importantly, in considering Dunn's impairments, Dr Dikranian concluded:

> It is reasonable that since she has been on a stable dose of Oxycontin chronically, that she has habituated to it and the likelihood of newly emerging adverse effects, including somnolence, impaired judgment, or confusion is low. Therefore, taken together, neither her diagnosed diseases nor her therapies constitute total disability or support an inability to perform a sedentary occupation with reasonable accommodations to stretch her knee at will to prevent stiffness during a workday."

TJH Certif. Ex. 51 p. 7 (emphasis added).

Dr. Dalpe also conducted an independent review, and concluded:

clinical progress notes . . . do not indicate that the claimant was experiencing symptoms to such severity that would interfere with her ability to perform her job . . . and there is no documentation indicating adverse effects of medication that would prevent the claimant from performing sedentary work at the time of denial.

Id. at p. 15.[8]

In the February 26, 2008 denial letter, the Plan Administrator specifically stated that it took into account Dr. Dikranian's conclusions regarding Dunn's physical and medication-related diagnoses, and Dr. Dalpe's conclusions regarding Dunn's psychological and medication-related diagnoses.  TJH Certif. Ex. 51 p. 2, Attach. A.  Given that the medical diagnoses in combination favored a return to sedentary work, Defendant did consider the combined effects of Dunn's medical conditions.

       3.    *The Plan Complied with ERISA Regulations by Providing Proper Notice to Dunn*

Plaintiff argues that Defendant violated ERISA by failing to provide notice to her regarding the reasons for the denial of the claim.  Dunn's argument in this regard is specious.  The ERISA statute provides:

Every employee benefit plan shall:

1) Provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.

29 U.S.C. §1133.  The Department of Labor has set forth regulations in accordance, stating in relevant part,

(1) Except as provided in paragraph (g)(2) of this section, the plan administrator

---

[8] In her brief, Dunn also argues that Defendant abused its discretion by failing to rationally consider the effects of Dunn's medications.  The reports by Dr. Dikranian and Dr. Dalpe reviewed the recommendations of the treating physicians as well as the IMEs.  Since the Pension Committee was under no obligation to give deference to Dunn's treating physicians, the Pension Committee's finding that Dunn's medications did not interfere with the duties of a sedentary job is also supported by substantial evidence.  See, supra, p. 18.

shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(I), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant--

I) The specific reason for the denial

ii) Specific reference to the pertinent plan provisions on which the denial is based

iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review. . .

29 C.F.R. § 2560.503(g).

Here, the Plan complied with the regulations.  Each letter sent to Dunn referenced the definition of total disability as defined by the Plan, and that benefits were being denied based upon findings that Dunn was capable of sedentary work.  TJH Certif. Ex. 31, 37-38, 51.  Each letter also provided the address of the relevant Administrator Dunn should contact if she wanted to file an appeal, or to request documents that were on file.  Id.  Finally, each letter informed Dunn of her right to appeal, and how to file such an appeal, with the initial denial letter and the final denial letter informing Dunn of her ERISA rights.  Therefore, Defendant complied with ERISA by providing Dunn adequate notice of the reasons of her claim denial and the procedures to appeal the denial.

4.      *Judicial Estoppel is Inapplicable to Dunn's Claim*

Plaintiff creatively argues that Defendant is judicially estopped from claiming that Dunn is capable of employment in any job.  Judicial estoppel is a judge-made doctrine that seeks to "prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same

27

or in a previous proceeding.  It is not intended to eliminate all inconsistencies. . . rather it is designed

to prevent litigants from playing fast and loose with the courts."  <u>Carnero v. Deitert</u>, 10 F. Supp.2d

440, 442-43 (D.N.J. 1996) (citation omitted).  The doctrine is only applicable where a party 1) has

asserted inconsistent positions 2) in bad faith.  <u>Id.</u> at 443.

Clearly, judicial estoppel is inapplicable to this action.  Plaintiff's reliance on <u>Micari v. Trans</u>

<u>World Airlines, Inc.</u>, 43 F. Supp. 275 (E.D. N.Y 1999)  is misplaced.  In that case, a plaintiff brought

a SSD claim, alleging that he was unable to perform his job.  He then filed a claim under the

Americans with Disabilities Act ("ADA") and New York Human Rights Law ("NYHRL") alleging

that if not for his disability he would have been able to perform the essential functions of his job.

Here, Defendant has never represented in any proceeding that Dunn is unable to work.  The fact that

Defendant hired a third party, Allsup, to assist Dunn with her own representations with regard to her

SSD claim in 1999 does not prevent Defendant from arguing here – years later – that Dunn is

capable of sedentary work, albeit its decision is without explanation.   Judicial estoppel is

inapplicable.

     5.    *Defendant's lack of mention of Dunn's Social Security Benefits*

Finally, Dunn points out that she was receiving SSD benefits, but Defendant failed to

consider this determination in its claims decision.  Dunn reasons that Allsup, hired by Defendant,

assisted her in obtaining these benefits in 1999, yet Defendant failed to address why her LTD

benefits were being denied in 2006 while she was receiving SSD benefits.  Based on this apparent

inconsistency, Plaintiff urges the Court to find Defendant's denial of her LTD benefits arbitrary and

capricious.

Both Dunn and Defendant agree that Defendant was not bound to grant Dunn's LTD benefits

28

simply because Dunn was receiving SSD benefits.  See Michaux v. Bayer Corp., 2006 WL 1843123, at *10 (D.N.J Jun. 30, 2006).  In order to receive SSD benefits, the established rule is that the claimant's treating physician is given greater weight in  claim determinations.  See Black and Decker Disability Plan v. Nord, 538 U.S. 822, 829 (2003) (citing 20 C.F.R. § 404.1527(d)(2)) (The Social Security Administration, the regulations inform, will generally "give more weight to opinions from ... treating sources," and "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").

However, in Nord, the Supreme Court concluded that a rule giving deference to the treating physician in ERISA cases would be improper.  Id. at 831 ("Nothing in the Act itself, however, suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."). The Court further stated:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Id. at 834.

> Nonetheless, an award of social security benefits

> may be considered as a factor in evaluating whether a plan administrator has acted arbitrarily and capriciously in reviewing a plaintiff's claim. . . . However, a Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and a plan administrator is not bound by the SSA decision.

Marciniak v. Prudential Financial Ins. Co. of America 184 Fed. Appx. 266, 269 (3d Cir. 2006); see

Michaux, 2006 WL 1843123 at *10 ("[w]hile there may be no legal requirement to address the decision of the administrative law judge, it may nevertheless prove useful to do so when making disability determinations. . . Evidence used in Social Security disability determinations, while not dispositive, is certainly of "at least some evidential value"); see also Marz v. Meridian Bancorp Inc., 32 Fed. Appx. 645, 647 (3d Cir. 2002).

Defendant argues that since the Pension Committee was under no obligation to review Dunn's SSD benefit claim in conjunction with her LTD claim, the failure to consider Dunn's SSD claim was not arbitrary and capricious.  On the other hand, relying on Michaux, Dunn argues that her SSD determination is highly relevant to her LTD claim.

In Michaux, the plaintiff, who was on SSD benefits, was denied LTD benefits without any consideration of SSD benefits.  The court found the failure to consider the plaintiff's SSD benefits highly significant:

> First, the standard for disability applied by the Social Security Administration is at least as exacting as the standard under the Plan. By statute, the claimant must prove that he is disabled due to a medical condition which precludes his ability to hold gainful employment at any job, see 42 U.S.C. § 1382c(a)(3), while the Plan confers disability benefits when unable to perform the current job or, after six months, any available job. . . where a Social Security disability claim is based upon disabling pain, the claimant must show medical signs and objective test results that would support the causation of the pain; hence, if the claimant's disability is based on pain, there necessarily had to be a conclusion by the Social Security Administration that it had an objective medical basis, something the Review Committee claimed was absent from the record here.

Michaux, 2006 WL 1843123 at *11 (emphasis added).

After examining the case, Plaintiff's reliance on Michaux is unwarranted.  Michaux involved a denial of a claim for LTD benefits at the outset: the court there determined that the plaintiff's receipt of SSD benefits was relevant in that case because it involved "[a] finding of total

disability by the Social Security Administration, concurrent with the application process at issue in this ERISA case . . . ." Id.  Here, Dunn was awarded SSD benefits in December 1999, after her claim for LTD benefits was approved and while she was receiving benefits.  Indeed, the initial claim decision was consistent with the determination of the Social Security Administration.  Dunn continued to receive LTD benefits for an additional six years based upon objective evidence produced by Dunn at that time.  However, in 2006, Dunn was examined by additional doctors pursuant to the Plan.  It was these doctors' opinion that Dunn is capable of working in a sedentary work environment - more than six years after SSD benefits were granted.  Based on these additional findings, Dunn no longer met the Plan's definition of disability based upon the medical evidence contained in the administrative record.  Accordingly, the Court has no basis to infer that the Social Security Administration would continue SSD benefits even with these recent medical reports.[9]

Nevertheless, the Court finds Defendant's failure to explain why it did not consider the SSD benefits in connection with the second appeal, explicitly requested by Plaintiff, is an additional procedural irregularity, which taken together with other deficiencies in Defendant's denial of Plaintiff's LTD benefits, necessitates this Court to remand this case for further administrative

---

[9]  To the extent that Plaintiff argues that Defendant's failure to indicate any improvements to her conditions after she had been on LTD benefits is arbitrary and capricious, such argument is without merit.  Defendant's prior determination of eligibility does not foreclose it from reassessing continued disability, because the Plan specifically requires that participants submit to subsequent examinations to reassess their eligibility. As such, Defendant's decision to revisit and reverse the earlier disability finding was not arbitrary and capricious. See Maciejczak v. P&G, 246 Fed. Appx. 130, 133 (3d Cir. 2007); see also Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 273-74 (5th Cir. 2004) ("We have found no statutory, regulatory, or jurisprudential authority ---- and neither Ellis nor the district court has cited any to us ---- that would heighten the level of the proof needed for a plan fiduciary to determine entitlement or non-entitlement to LTD benefits simply because the fiduciary previously had approved entitlement and paid benefits to the employee in question").

review.  Indeed, remand is the appropriate remedy in cases where: (1) the plan administrator "has misconstrued the Plan and applied a wrong standard to a benefits determination," Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 460 (9th Cir.1996); see also Addis v. Limited Long-Term Disability Program, 425 F.Supp.2d 610, 620 (E.D.Pa.2006); (2) the plan administrator has "fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision," Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1288 (10th Cir.2002); see also Gallo v. Amoco Corp., 102 F.3d 918, 923 (7th Cir.1996) (stating "[t]he remedy when a court or agency fails to make adequate findings or to explain its grounds adequately is to send the case back to the tribunal for further findings or explanation .... unless the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground"); or (3) "[t]he present record is incomplete," Miller v. United Welfare Fund, 72 F.3d 1066, 1075 (2nd Cir.1995); see also Kaelin v. Tenet Employee Benefit Plan, 2006 WL 2382005, at *10 (E.D. Pa. Aug. 16, 2006); Moskalski, 2008 WL 2096892 at *10 ("Remand is suitable when the defendant 'fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision,' or if the record before the court is incomplete"(citations omitted)).[10]   Here, since the Court has

---

[10]   While the Third Circuit has not defined the precise contours of the availability of a remand in ERISA cases, it has utilized this remedy. In Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan, 298 F.3d 191, 193 (3d Cir.2002), a claimant filed suit after being denied payment of medical claims arising from an accident that occurred while he was driving under the influence of alcohol. The insurer denied coverage on the ground that driving while intoxicated is an illegal activity, and the plan "exclude[d] coverage for any charge for care, supplies, or services which are ... [c]aused or contributed to by the [insured's] commission or attempted commission of a felony, misdemeanor, or being engaged in an illegal occupation or activity." Id. at 193 (internal quotation marks omitted). However, the Third Circuit ruled that this decision was arbitrary and capricious, because "the administrator did not believe that it had to actually find a causal connection in the way we believe the plan in question requires." Id. at 200. The court concluded "because the administrator misperceived its task, we will remand for it to consider in the first instance whether there is evidence from which it could reasonably conclude

"considerable discretion" in selecting a remedy, it finds that the facts weigh in favor of remand rather than reinstatement of LTD benefits. While the record contains some evidence that Dunn would be able to return to sedentary work, nonetheless, the Claims and Plan Administrators have not made adequate factual findings, nor explained, Dunn's residual physical capacity and the type of sedentary jobs Plaintiff is capable of working.  Absent these findings, the Court cannot make an adequate assessment of whether Defendant's denial was arbitrary and capricious.  As such, the Court remands this matter for further administrative review by Defendant.

Accordingly, Plaintiff's request for attorneys' fees is denied without prejudice.

**CONCLUSION**

Based on the foregoing, Defendant's motion for summary judgment is DENIED.  Plaintiff's motion for summary judgment is GRANTED to the extent that the Court remands this case for further administrative review.

DATED:  September 2, 2009

_____/s/Freda L. Wolfson_____
The Honorable Freda L. Wolfson
United States District Judge

_____

that Smathers' intoxication played a causative role in his injuries." Id.; see also Syed v. Hercules Inc., 214 F.3d 155, 162 (3d Cir.2000) (stating "the remedy for a violation of § 503 [of ERISA] is to remand to the plan administrator so the claimant gets the benefit of a full and fair review"); see also Mitchell, 113 F.3d at 436 (utilizing remand as a remedy).